## STATE vs. ANTONIO CRESTE.

### 1. HOMICIDE—EVIDENCE—MATERIALITY.

In a prosecution for homicide, where there was no contention that the prisoner had attempted to escape, evidence that immediately after the shooting he asked the witness to notify the police is immaterial.

### 2. HOMICIDE—EVIDENCE.

In a prosecution for the killing of his son-in-law, whom accused shot during an attack, evidence leading accused to believe that deceased was a member of a Black Hand society which had been threatening his life is admissible.

### 3. HOMICIDE—WHAT CONSTITUTES—DEGREES.

"Homicide" is the killing of one human being by another; and felonious homicide is of three degrees, murder in the first and second degrees and manslaughter.

### 4. HOMICIDE—DEFINITION—"MALICE."

The term "malice", as used in homicide cases, is a condition of the heart or mind, and is not restricted to spite or malevolence toward a particular person, but includes a general malignity and reckless disregard of human life

5. HOMICIDE—EVIDENCE—PRESUMPTIONS.

In homicide cases malice is presumed, and the burden is on the prisoner to show that the killing was without malice, where the fatal act is done deliberately or without adequate cause.

6. HOMICIDE—MURDER IN THE FIRST DEGREE.

Where a killing was done with express malice aforethought, or in attempting to perpetrate a crime punishable by death, the offense is murder in the first degree.

7. HOMICIDE—MURDER IN THE FIRST DEGREE—EXPRESS MALICE AFORE-
   THOUGHT.

Express malice aforethought is present where one person kills another with a sedate, deliberate mind and a formed design, which may be established by antecedent threats or evidence of malevolence.

8. HOMICIDE—MURDER IN THE FIRST DEGREE—DEADLY WEAPON.

The use of a deadly weapon in killing another is a circumstance which, in the absence of rebutting evidence, indicates a deliberate, formed design to kill; and all such homicides are presumed to be malicious until the contrary appears.

9. HOMICIDE—MURDER—DELIBERATION.

The length of deliberation essential to express malice aforethought is immaterial.

10. HOMICIDE—MURDER IN THE SECOND DEGREE.

Where a killing is done with implied malice, which is merely an inference of law, it is murder in the second degree.

11. HOMICIDE—MANSLAUGHTER.

In manslaughter, the element of malice must be absent; and in order to reduce homicide to manslaughter the provocation must be so great as to produce a transport of passion, rendering the accused for the time being deaf to reason.

12. HOMICIDE—DEGREES.

As no looks, words, or gestures, however insulting, can justify an assault, neither can a simple assault justify the killing of another with a deadly weapon, so as to reduce the offense to manslaughter.

13. HOMICIDE—SELF-DEFENSE—BURDEN OF PROOF.

One accused of homicide has the burden of establishing self-defense to the satisfaction of a jury.

14. HOMICIDE—SELF-DEFENSE.

In repelling an assault, no more force can be used than is necessary, and if the person assailed uses for his defense a disproportionate force he becomes the aggressor, and his right of self-defense is thus destroyed; consequently a man cannot repel a simple assault with a deadly weapon.

15. HOMICIDE—TRIAL—QUESTIONS FOR JURY.

Whether accused was justified in using a deadly weapon in self-defense is for the jury, who must be satisfied that the danger was such as would justify an ordinarily prudent man in taking such measures of defense; the criterion not being what the accused saw fit to do, but what an ordinary man would have done under the circumstances.

Statement.

16. HOMICIDE—SELF-DEFENSE.

No man may take the life of another, even in self-defense, unless there is no other available means of escape from death or great bodily harm.

17. HOMICIDE—GOOD CHARACTER—EVIDENCE.

In a prosecution for homicide, evidence of good character is to be taken in connection with all the other evidence, and given such weight as in the judgment of the jury it is entitled to.

18. CRIMINAL LAW—PRESUMPTIONS—REASONABLE DOUBT.

Every one accused of crime is presumed innocent until his guilt is proven to the satisfaction of the jury beyond a reasonable doubt.

19. CRIMINAL LAW—REASONABLE DOUBT.

The reasonable doubt which will justify the jury in acquitting one accused of crime must be a substantial doubt, and not a mere fanciful, vague, or speculative doubt.

20. INDICTMENT AND INFORMATION—TRIAL—INDICTMENTS.

Under an indictment charging murder in the first degree, an accused may be convicted of murder in any degree or manslaughter.

(*March* 6, 1913.)

PENNEWILL, C. J., and BOYCE and CONRAD, J. J., sitting.

*Josiah O. Wolcott*, Attorney General, and *Frank M. Jones*, Deputy Attorney General, for the State.

*William G. Jones, Jr.*, and *J. Frank Ball* for the defendant.

Antonio Creste was indicted (No. 74, March Term, 1913) for murder in the first degree. Verdict, not guilty.

At a Court of Oyer and Terminer, in and for New Castle County, beginning March 6, 1913, the prisoner, Antonio Creste. was placed on trial for the murder of Antonio Richardo, alleged to have occurred on December 15, 1912, at Mt. Cuba in Mill Creek Hundred, New Castle County.

The following facts, among others, were developed from the testimony:

That in the late afternoon of December 15, 1912, just before dark, Antonio Richardo, the son-in-law of the prisoner, and two other Italians were drinking cider in a shed at Mt. Cuba, near the home of the latter, who about an hour later joined them, drinking two glasses of cider with them; that thereupon Richardo asked Creste, "Why did you say that I starved my wife to death?" (meaning the dead daughter of Creste); that Creste turned around and said, "It is not so"; that Richardo then took off his

coat, threw it upon the ground, approached Creste and struck him in the face with his fist, which did not knock Creste down or stagger him but caused his nose to bleed; that Creste then said to Richardo, "All right," and started off towards his house in a stooping position with his hands over his face. That when Creste had gone about thirty feet Richardo started in a half-run after him, overtaking Creste in his own yard about forty feet from the place that Creste had started from; that Richardo said to Creste, "Where are you going?" and being at his back, grabbed him by the collar of his coat and placed his other hand upon Creste's shoulder, (The defendant claimed that Richardo thereupon grabbed him by the throat and choked him) whereupon Creste pulled his revolver from his pocket and holding it over his head pointing back and shot Richardo, the bullet entering the left side of the head, penetrating about two inches and lodging in the brain, producing septicaemia or meningitis, from which Richardo died at the Delaware Hospital on the thirty-first of the same month. It was testified that Richardo lived with his children in one side of a double house owned by Creste, the other side being occupied by Creste and his family.

The prisoner admitted that he shot over his own head and killed Richardo, but contended that at the time he was in great fear of being choked to death, and shot to save his life; that he also had reason to believe that Richardo was a member of or in league with a Black Hand Society which had sent him numerous letters threatening to kill him and burn his house and family, unless he delivered to it $3,000, and that owing to his nervous condition because of the receipt of these letters and his belief at the time he was attacked by Richardo that it was Richardo's intention to kill him, as the letters showed that some one in his family or near him was giving information to the Black Hand Society as to his movements—one of the letters commanding him to bring the money in a certain red satchel which he had; and furthermore that Richardo had said to him on several occasions, "Give me the money and let me fix this thing up for you or they will kill you. I can fix it up and it will all be dropped." The prisoner testified that Richardo knew that he had seen Mr.

Plummer, that he threatened to kill him if he sent any more letters to the Postoffice authorities to investigate, and because of the threat, he stopped handing over the letters to the Postoffice Inspector.

Counsel for defendant sought to prove by a witness that the defendant immediately after the shooting, asked the witness to notify the police.

Objected to by the state as immaterial, there being no contention that the prisoner had attempted to run away.

CONRAD, J.:—The court sustains the objection that it is immaterial.

After the prisoner had identified two letters dated August third and September 6, 1912, as received by him regularly through the mail (referred to above), which he had taken to Chief of Police in Wilmington, who sent him to Mr. Plummer, United States Postoffice Inspecter, he was asked "What, if anything did you do with those letters when you went to Mr. Plummer's office?"

This was objected to by the Attorney General as immaterial; and before the discussion upon the admissibility of the question had proceeded far, the jury were asked by the court to retire to their room.

PENNEWILL, C. J.:—Is not the law in this state this,—that if from the facts and circumstances shown from the evidence the defendant at the time he fired the fatal shot believed, and was justified in believing, that he was at that time in danger of death or great bodily harm at the hands of the deceased, then he had a right in self-defense to commit the act?

*Mr. Wolcott:*—I think that is substantially correct.

After hearing the argument of counsel the court stated that they would like to hear Mr. Plummer and what he said to the prisoner, before passing upon the question.

Mr. Plummer, United States Mail Inspector, thereupon stated that on September 9, 1912, the prisoner came to see him about the letters referred to, and that in accordance with the arrangement suggested in the letters he and Frank, the son of the prisoner, went to the place mentioned with a Philadelphia

Evidence—Opinion.

Inspector but had no result. They made a second trip with no result, after which another letter came to Creste notifying him that he had sent that person to tip him off, but they were not imbeciles; that they would come as soon as he would bring some friend that he could confide in, and to bring a little red satchel, etc. The Inspector stated that he said to Creste, "Tony, I don't understand where all this leak is. You must be talking; I have not said anything"; and that Creste said: "Mr. Plummer, I have not." "Well," I said: "It must be somebody in your household who knows you have got a little red satchel and that it has got a handle to it. It makes me think that somebody near you in your household is giving the information away concerning our movements. It must be Frank or your son-in-law giving the thing away. I can't understand anything else about it." Creste said he did not know whether they were or not, but he would look into it and see; I never had any other communication from him until after the killing occurred. This was about three months before the murder.

CONRAD, J., delivering the opinion of the court:

We are of the opinion that if the defendant did receive information from the post office inspector who had investigated the case, and from other sources, from which he believed, and was justified in believing, at the time he committed the fatal act, that the deceased had threatened his life or was a member of a society that made such threats, and the prisoner believed he was then in imminent danger of suffering death or great bodily harm at the hands of the deceased, the information is admissible. It will be for the jury to say whether the prisoner was justified in believing from the information he received that he was in such danger. The objection to the question which we have had under consideration is overruled.

The jury were requested to return to the box, and the question was read to the witness:

"Q. What, if anything, did you do with those letters, when you went to Mr. Plummer's office?"

"A. I gave Mr. Plummer the letters.

"Q. Acting on information, or what Mr. Plummer told you, did you send any one to Philadelphia; and if so, whom?

"A. I sent Frank.

"Q. Who is Frank?

"A. My son.

"Q. Who went with Frank?

"A. Mr. Plummer." .

The two letters above referred to and another, all written in Italian, together with the translations, were admitted in evidence, subject to a motion by the state to strike out if not properly connected.

The prisoner then testified that he received other letters from what he believed to be the Black Hand Society after taking the first letters to Inspector Plummer; that while receiving these letters Richardo was frequently in his house at nights and knew all about the matter, and that Richardo said to Creste: "You had better settle this thing, or you will get killed some of these days. You had better give me $1,000 and I will go up there and settle with the people." The prisoner continued: "I said: 'I don't have no money; I can't raise no money to pay this one thousand dollars, because I don't own that much.' He said: 'Well, you sell this property and raise the one thousand dollars if you haven't one thousand dollars. You get one thousand dollars some place and give it to me, and I go up and pay and fix this thing up with the people and you have no bother no more and nobody will threaten you any more.' The last time he told me this was on Friday before the fight. At that time he said: 'You want to get that $1,000.' I said: 'Tony, you know that I don't have that much money.' He said: 'You had better go get this one thousand dollars; if you don't, I'll kill you.' "

Letters to the prisoner dated August 3rd, September 6th, September 19th, September 27th, October 4th, October 7th, October 31st, and November 7th, 1912, having been identified and admitted in evidence, were read to the jury by the prisoner's counsel, who then rested.

In rebuttal the state was allowed, against objection, to prove that the prisoner had said in the presence of a witness that a man

Evidence—Prayers.

from Wilmington was writing him the Black Hand Society letters; also that Creste had asked Richardo on the evening of the day when certain of the letters were received from the said society to go to Washington Park and meet the man in the boat, as the letter suggested, and that Richardo turned around and said: "They are likely to upset the boat and drown me. I've got two little children. What do you want to do; leave my little ones out in the street?"

The state was also allowed to show by another witness, against the objection of the prisoner's counsel, that Richardo during the time the letters were being received said, in the presence of Creste: "I've got two children. I can't leave them to sleep in the nighttime; they are always afraid of them (meaning the Black Hand Society). I'm always watching the house in the nighttime."

Witness also stated that he saw Richardo, while the letters were being received, watching the house at night with a gun.

### PRAYERS FOR THE STATE.

If the jury are satisfied from the evidence that the prisoner, when he killed the deceased, deliberately intended so to do, the length of time that said intention existed is immaterial, and the killing under such circumstances would be murder. *State v. Honey*, 6 *Penn.* 150, 65 *Atl.* 766. The prisoner must show that what he did was only for the purpose of saving his own life or to escape great bodily harm; neither fear nor apprehension of death or of great bodily harm will totally excuse one for killing another, but to have effect in law, the danger must be imminent and impending at the instant, and must be real, not imaginary. He must have declined the combat and retreated from his assailant as far as he could do so consistently with his own safety. *State v. Hollis*, 1 *Houst. Cr. Cas.* 27. The jury must be satisfied that the peril or danger was such as would justify an ordinarily prudent man in taking such measures of defense. It is not what a man may see fit to think in such strait, but what an ordinarily prudent man would do, and what the prisoner reasonably believed

from the circumstances surrounding him and known to him at that time. *State v. Emory*, 5 *Penn.* 131, 58 *Atl.* 1038.

Neither the mere fact that an attack was made upon the prisoner by the deceased, nor the fact that the deceased had made threats against the prisoner, would justify the shooting of the deceased, unless the prisoner had reasonable cause to believe, and did believe at the time of the shooting, that he was in imminent danger of death or great bodily harm and that he had no other reasonable means for preventing death or great bodily harm. *State v. Wiggins*, 7 *Penn.* 133; 76 *Atl.* 632. Even though the prisoner believed that the deceased wrote the threatening letters, or was associated in design with the person who wrote them, yet that circumstance alone would not be a justification for the killing. Such circumstance is to be taken into consideration with all the other circumstances, to determine whether or not the prisoner was placed in jeopardy such as the law of self-defense would justify the resort to the employment of a deadly weapon, and killing the deceased.

The defendant requested the usual prayers applicable to the facts of the case.

CONRAD, J., charging the jury:

Gentlemen of the jury:—The prisoner, Antonio Creste, is indicted for the murder of Antonio Richardo, on the fifteenth day of December last, in Mill Creek Hundred, in this county.

The prisoner admits that he took the life of the deceased, but contends that he did so in necessary self-defense.

[3-5] Homicide is the killing of one human being by another. Felonious homicide is of three kinds: Murder of the first degree, murder of the second degree, and manslaughter. Malice is an essential ingredient of the crime of murder of both degrees. Without malice there can be no murder either of the first or of the second degree. Malice is a condition of the mind or heart. As here used this term is not restricted to spite or malevolence toward the particular person slain, but also includes that general malignity and reckless disergard of human life which proceed from a heart void of a just sense of social duty and fatally bent on mischief.

Wherever the fatal act is done deliberately or without adequate cause, the law presumes that it was done with malice, and the burden is on the prisoner to show from the evidence, or by inference from the circumstances of the case, that the act was not done with malice.

[6-9]  Murder of the first degree is where the killing was done with express malice aforethought, or in perpetrating or attempting to perpetrate a crime punishable with death.  Express malice aforethought is where one person kills another with a sedate, deliberate mind and formed design, which formed design may be manifested in many ways; as, for instance, by lying in wait for the deceased, or by antecedent menaces or threats that disclose a purpose on the part of the prisoner to commit the act charged, or by a former grudge, ill will, spite, hatred, or malevolence towards the deceased, or any other circumstances which disclose the purpose or intention of the accused toward his victim at the time when the crime was committed.  The deliberate selection and use of a deadly weapon is a circumstance which, in the absence of satisfactory evidence to the contrary, indicates the existence in the mind of the person committing the act of a deliberate formed design to kill.  All homicides with a deadly weapon are presumed to be malicious until the contrary appears by the evidence, and the burden of proof to the contrary lies on the accused.  Where the killing by a deadly weapon is admitted or proved, malice aforethought is presumed, in the absence of evidence to the contrary, and the burden of showing the contrary is on the accused, as the natural and probable consequences of the act are presumed by the law to have been intended by the person in using a deadly weapon.  If the jury are satisfied from the evidence that the prisoner, when he killed the deceased, deliberately intended so to do, the length of time that said intention existed is immaterial, and the killing under such circumstances would be murder.

[10]  Murder in the second degree is where the killing was done with implied malice.  Implied malice is an inference or conclusion of law from the facts found by the jury.  Murder of the second degree is where there was no deliberate mind or formed

design to take life or to perpetrate a crime punishable with death, but where the killing was done without justification or excuse and without provocation, or without sufficient provocation to reduce the offense to manslaughter.

[11] Manslaughter is where one person unlawfully kills another without malice. In order to reduce the crime to manslaughter, the provocation must be very great—so great as to produce such a transport of passion as to render the person for the time being deaf to the voice of reason. While murder proceeds from a wicked and depraved spirit and is characterized by malice, manslaughter results from no malignity, but from unpremeditated and unreflecting passion.

[12] No looks or gestures, however insulting, no words, however opprobrious or offensive, can amount to a provocation sufficient to excuse or justify even a slight assault. Nor can a slight assault excuse the killing of an assailant with a deadly weapon, so as to reduce the offense from the grade of murder to that of manslaughter.

[13-15] The burden of establishing self-defense to the satisfaction of the jury rests upon the prisoner. In repelling or resisting an assault, no more force may be used than is necessary for the purpose, and if the person assailed use in his defense greater force than is necessary for that purpose, he becomes the aggressor. A man may defend himself against his assailant, but he cannot do so as he pleases. If one be assaulted with the fist he may not defend himself with a club or a deadly weapon, because the defense is disproportioned to the offense, and if in such defense death ensues, the law implies malice from the character of the weapon used. It is for the jury to determine, under all the circumstances of the case, whether the prisoner was justified in using a deadly weapon in self-defense at the time and in the manner proven in the testimony. You must be satisfied that the peril or danger was such as would justify an ordinarily prudent man in taking such measures of defense. It is not what a man may see fit to think in such strait, but what an ordinarily prudent man would do, and what the prisoner reasonably believed from the circumstances surrounding him and known to him at that time.

Charge.

If you believe from the evidence that the deceased did first attack the prisoner, and that the prisoner had previously received information which led him to believe and which justified him to believe at the time he committed the fatal act that the deceased had threatened his life or that the deceased was in any wise connected with the threatening letters introduced in the case, then such threats and letters taken in connection with the character of the attack made upon the accused by the deceased become the proper subject for your consideration in determining whether or not the deceased by his acts created in the mind of the accused, at the time of the shooting, a reasonable belief that he was in danger of death or great bodily harm.

[16] No one may take the life of another, even in the exercise of the right of self-defense, unless there is no other available means of escape from death or great bodily harm. If the jury are satisfied from the evidence that the deceased first attacked the prisoner, and that from the character of such attack the prisoner had reasonable cause to believe, and did believe, that he was in imminent danger of death or great bodily harm, and that he had no other reasonable means of avoiding or preventing death or great bodily harm, then the killing of the deceased was a justifiable act of self-defense, and the prisoner should be acquitted of any crime whatever.

[17] The good character of an accused person, when proved, is to be taken in connection with all the other evidence in the case, and is to be given just such weight, under all the facts and circumstances of the case, as in the judgment of the jury it is entitled to.

[18, 19] In every criminal case the accused is presumed to be innocent until his guilt is proved to the satisfaction of the jury beyond a reasonable doubt. If, after carefully and conscientiously considering and weighing all the evidence in the case, you should entertain a reasonable doubt of the guilt of the prisoner, that doubt must inure to his benefit, and your verdict should be not guilty. But such a doubt must not be a mere fanciful, vague or speculative doubt, but a reasonable substantial doubt, remaining in your minds after a careful consideration of all the evidence, and such a doubt as reasonable, fair-minded and conscientious men

Verdict.

would entertain under all the facts and circumstances of the case.

[20]   Under this indictment, if the evidence shall so warrant you, you may find the prisoner guilty in manner and form as he stands indicted—that is, guilty of murder in the first degree—or guilty of murder in the second degree, or guilty of manslaughter, or not guilty. The matter is in your hands for your intelligent determination.

Verdict, not guilty.